United States District Court
Southern District of Texas
**ENTERED**
March 31, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **ST. LUKE'S UNITED METHODIST CHURCH,** | § § § | |
| **Plaintiff,** | § § | |
| v. | § § | Civil Action No. 2:20-CV-00053 |
| **CHURCH MUTUAL INSURANCE COMPANY,** | § § § | |
| **Defendant.** | § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff St. Luke's United Methodist Church seeks coverage for property damage under an insurance policy issued by Defendant Church Mutual Insurance Company. Both Parties agree that the church was damaged during Hurricane Harvey and that some of the damage is covered by the insurance policy. Both Parties also agree that the breach of contract claim should proceed to trial because there is a dispute over how much of the damage is covered by the policy. But the Parties disagree about whether St. Luke's extracontractual bad faith claims should proceed. St. Luke's argues that there is a genuine issue of material fact as to whether Church Mutual acted in bad faith. Church Mutual disagrees and moves for partial summary judgment. For the following reasons, the Court **DENIES** the Motion for Partial Summary Judgment.

# I.    BACKGROUND

## A.    PROCEDURAL BACKGROUND

This lawsuit began over two years ago when St. Luke's sued Church Mutual in the

214th Judicial District Court of Nueces County.  (Dkt. No. 1-3).  Church Mutual removed

the case to this Court on the basis of diversity jurisdiction.[1]  (Dkt. No. 1).  Church Mutual

filed its Motion for Partial Summary Judgment, (Dkt. No. 20), to which St. Luke's filed a

Response, (Dkt. No. 23), and Church Mutual filed a Reply, (Dkt. No. 24).

## B.    FACTUAL ALLEGATIONS IN THE ORIGINAL PETITION

St. Luke's is a church in Corpus Christi that was damaged during Hurricane

Harvey.  (Dkt. No. 1-3 at 2–3).  St. Luke's' insurance policy with Church Mutual covered

certain damage to its property, including damage caused by wind and water.  (*Id.* at 2).

After Hurricane Harvey, St. Luke's submitted a claim.  (*Id.* at 3).  But Church Mutual

allegedly failed to fulfill its obligations by improperly investigating and wrongfully

denying St. Luke's' claim.  (*Id.* at 3, 5).  Accordingly, St. Luke's asserts the following claims

under Texas law: breach of contract; Chapters 541 and 542 of the Texas Insurance Code;

common law duty of good faith and fair dealing; and declaratory judgment.  (*Id.* at 2–5).

St. Luke's seeks monetary damages of over one million dollars, enhanced or treble

damages, interest, costs, attorney's fees, and expenses.  (*Id.* at 2, 4–5).

---

[1]    Neither party contests diversity jurisdiction under 28 U.S.C. § 1332.  St. Luke's is a citizen of Texas.  (Dkt. No. 1 at 1); (Dkt. No. 1-3 at 1).  Church Mutual is a citizen of Wisconsin.  (Dkt. No. 1 at 1).  And the amount in controversy exceeds $75,000.  (Dkt. No. 1-3 at 2).

C.     EVIDENCE IN THE RECORD

1.     **The Policy**

The insurance policy issued by Church Mutual to St. Luke's was in effect during

Hurricane Harvey.  (Dkt. No. 20-1 at 1–2).  The insurance policy is a Replacement Cost

policy.  (*Id.* at 6).  Specifically,

> If Replacement Cost is shown in the Declarations Page as
> applicable to Covered Property, we will determine the value
> of the Covered Property in the event of loss or damage as
> follows . . . .
>
>> (3) We will not pay on a Replacement Cost basis for
>> any loss or damage:
>>
>>> (a) Until the lost or damaged property is
>>> actually repaired or replaced; and
>>>
>>> (b) Unless the repairs or replacement are made
>>> as soon as reasonably possible after the loss or
>>> damage.

(*Id.* at 15).  The policy also provides an option for St. Luke's to seek coverage on an Actual

Cash Value (ACV) basis instead of on a Replacement Cost Value (RCV) basis.  (*Id.*).

2.     **The Insurance Claim**

On August 25, 2017, St. Luke's' church was damaged during Hurricane Harvey.

(Dkt. No. 20-2 at 1).  The hurricane impacted the steeple, roof, and interior of the church.

(Dkt. No. 23-1 at 4, 21, 47).  Four days later, St. Luke's submitted an insurance claim.  (Dkt.

No. 20-2 at 1).   While Church Mutual acknowledged the claim the next day, its

acknowledgment included a windstorm exclusion.  (*Id.*).  Specifically,

> Please note that your policy . . . *excludes* damages caused
> directly or indirectly by *Windstorm* or Hail, regardless of any
> other cause or event that contributes concurrently or in any

sequence to the loss or damage; or caused by rain, whether
driven by wind or not, if that loss or damage would not have
occurred but for the Windstorm or Hail.

(*Id.*) (emphases added).   Church Mutual's corporate representative, Lynn Renlund,

concedes that this windstorm exclusion should never have been included in St. Luke's'

policy.  (Dkt. No. 23-1 at 2–4).

### 3.   The Investigation

An inspection ensued.   Brian Briggs, an independent adjuster, inspected the

church on September 1, 2017—two days after the insurance claim was submitted.  (Dkt.

No. 20-4 at 1).  Briggs identified damage to the roof and interior of the church.  (*Id.* at 2–

6).   After factoring in the deductible and other costs, Briggs calculated a net claim of

$34,019.79.[2]  (*Id.* at 7–9).  Briggs also informed St. Luke's that it should contact the Texas

Windstorm Insurance Association.  (Dkt. No. 23-1 at 4); (Dkt. No. 23-2 at 2–4).  It is unclear

why Briggs instructed St. Luke's to do so.

Sometime in September 2017, Church Mutual denied St. Luke's windstorm

coverage.  (Dkt. No. 23-1 at 5–6, 54–56).  But, as early as September 19, 2017, Church

Mutual discovered that St. Luke's did, in fact, have windstorm coverage.  (*Id.* at 8–10, 47);

(Dkt. No. 20-1 at 1).  Church Mutual retroactively applied the change.  (Dkt. No. 20-1 at

1).

Church Mutual's September 28, 2017 letter—sent approximately one month after

the claim was submitted—requests an additional thirty days to complete its investigation.

---

[2]     Briggs's report breaks down the net claim into three categories: church ($33,359.40), (Dkt.
No. 20-4 at 7), other structures ($354.40), (*id.* at 8), and personal property ($305.99), (*id.* at 9).

(Dkt. No. 20-3); (Dkt. No. 23-1 at 9).  On the same day, Church Mutual's property claims supervisor recommended that Church Mutual retain an engineer "to assess the structural integrity of the steeple" and, if applicable, "find a couple of qualified contractors."  (Dkt. No. 23-1 at 8, 10–11, 45).

At the beginning of October 2017, Church Mutual hired Rimkus Consulting Group Inc., ("Rimkus"), to examine the steeple, including its structural integrity, and determine whether any of the interior water damage was from the steeple.  (*Id.* at 16, 44).

A few weeks later, in mid-October 2017, Church Mutual sent St. Luke's a letter containing key information.  First, Church Mutual stated that it had "completed [its] analysis of potential policy benefits" arising out of St. Luke's insurance claim.  (Dkt. No. 20-5 at 1).  Second, Church Mutual provided an estimate of damages based on the ACV portion of the loss, including a breakdown of the figures supporting the $34,019.79 payment.  (*Id.*).  The breakdown includes figures like "Replacement Value of Loss" and the deductible, but it does not otherwise explain how the figures were calculated.  (*Id.*). Third, Church Mutual explained that repairs should be completed "within 180 days if possible" in order to recover depreciation.  (*Id.*).  Finally, Church Mutual notified St. Luke's that it needed an additional thirty days to complete a full investigation because Church Mutual was waiting on findings from Rimkus regarding damage to the church steeple.  (*Id.* at 2).  Notably, the $34,019.79 payment was based on Briggs's estimate from the original inspection, which covered certain damage to the church, "other structures," and personal property.  (Dkt. No. 20-4 at 7–9); (Dkt. No. 23-1 at 12–13).

Sometime in November 2017, Rimkus requested scaffolding from Church Mutual to aid in examining the damage to the roof of the church and steeple. (Dkt. No. 23-1 at 18–21). Apparently, the request went unanswered because Rimkus reiterated its request for scaffolding in January 2018. (*Id.* at 21–22). Rimkus, by this point, had collected cost estimates for scaffolding. (*Id.* at 21). As of the beginning of February, Church Mutual still had not authorized scaffolding to inspect the church.[3] (*Id.* at 22).

In February 2018, Todd Van Sant of Guardian Consulting was brought into the picture to prepare an estimate regarding damage to the church and the corresponding repair. (Dkt. No. 23-3 at 3–4); (Dkt. No. 23-1 at 79). Van Sant inspected the church in March 2018. (Dkt. No. 20-6 at 1); (Dkt. No. 23-3 at 6, 13); (Dkt. No. 23-1 at 79). The inspection included Van Sant physically getting inside a basket that was then lifted by a crane. (Dkt. No. 23-3 at 6). After this initial inspection, Rimkus concluded that scaffolding was indeed necessary to examine the steeple—"as originally thought." (*Id.* at 6, 9–10). Van Sant's inspection was approximately seven months after Briggs's inspection. *Compare* (Dkt. No. 20-6 at 1) *with* (Dkt. No. 20-4 at 1). At some point, scaffolding was finally used to inspect the damage to the steeple.[4] (Dkt. No. 23-1 at 23).

---

[3]     Church Mutual's corporate representative, Lynn Renlund, attributed the delay to giving St. Luke's the option to choose who it wanted to use for scaffolding. (Dkt. No. 23-1 at 1, 29). At least one Church Mutual employee, Leah Henkelman, expressed concern about the timeline when she stated that Church Mutual "cannot have any more delays on this file." (*Id.* at 28–30). Henkelman then told the adjuster to agree to using scaffolding and schedule the inspection. (*Id.* at 23).

[4]     St. Luke's cites (Dkt. No. 23-1 at 23) as evidence that the scaffolding went up in a particular month. *See* (Dkt. No. 23 at 7). But the deposition transcript indicates that the *attorney* stated when the scaffolding went up. The witness responded, "Okay." (Dkt. No. 23-1 at 23). St. Luke's, therefore, does not provide evidence as to when the scaffolding went up.

Later, in November 2018, Van Sant completed a second inspection.  (Dkt. No. 23-3 at 10–11, 13).

### 4.    Damage Calculations

Van Sant's final report from late-February 2019 details the timeline of the church inspection.  (Dkt. No. 23-1 at 79–81).  He explains:

> Upon close-up examination to the tower by scaffold, it was determined that the damages to the masonry work on the tower was much more significant and that the cross was unsalvageable and required replacement.  The roof, however, was not significantly damaged . . . .  Due to the increased damages to the steeple structurally, the costs of this estimate increased dramatically.

(*Id.* at 79–80).  The total estimated cost of repair is listed as $1,676,314.83.  (*Id.* at 94).

After Van Sant submitted his first estimate, he spoke with Church Mutual's adjuster, Gary Roos, and then revised his estimate.  (Dkt. No. 23-3 at 19–21).  Among other changes, Van Sant reallocated portions of his estimate as code-upgrade costs and depreciation.  (*Id.*).  His revised estimate lists $699,722.49 as code-upgrade costs—which substantially reduced the payout under the policy.  (Dkt. No. 23-1 at 117).

In listing these repair costs as code upgrades, Van Sant relied on information provided by Church Mutual's adjuster.  (Dkt. No. 23-3 at 21).  Van Sant, however, did not state which building codes apply to the church repairs.  (*Id.* at 21–22).  Van Sant also applied depreciation in the range of 40–50%, again at the direction of Church Mutual's adjuster.[5]  (*Id.* at 18, 20–21).

---

[5]    Church Mutual's general practice is to not depreciate "anything more than 50 percent even if the calculation should be more than 50 percent based on," for example, the age of the
(continue)

St. Luke's' expert witness disagrees with Van Sant's estimate.  In August 2020, that expert concluded that the code-upgrade costs are just $83,808.04.  (Dkt. No. 23-4 at 149, 151).  The difference between the $699,722.49 code-upgrade estimate of Church Mutual and the $83,808.04 code-upgrade estimate of St. Luke's is the heart of their dispute.

### 5.   Insurance Payments

In June 2019, Church Mutual issued a $111,290.83 payment to St. Luke's.  (Dkt. No. 20-7).  Church Mutual explained that St. Luke's may recover depreciation by completing repairs and replacement within 180 days.  (*Id.*).  The $111,290.83 appears to be the second payment issued to St. Luke's.

In March 2021, Church Mutual issued a third payment of $277,444.15.  (Dkt. No. 20-9 at 1).  Of that amount, $100,000 was for the "Code Compliance Policy Limit" and the rest for "Holdback."[6]  (*Id.*).  Less than a month after this payment, Church Mutual issued St. Luke's a fourth payment, this time for $162,895.11.  (*Id.* at 2).

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d

---

building.  (Dkt. No. 24-1 at 6).  There is no other evidence regarding Church Mutual's depreciation practices.

[6]   Both Parties agree that the insurance policy has a $100,000 limit for covering code.  (Dkt. No. 23 at 2); (Dkt. No. 24 at 4).

605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must then come forward with specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (citations omitted).  "The nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim." *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (cleaned up).  "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citation omitted).

The nonmovant's burden "will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)

9

(internal quotations omitted).  In reviewing a motion for summary judgment, the district court must view the evidence in the light most favorable to the nonmovant.  *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).  This means that factual controversies are to be resolved in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075.

## III.  DISCUSSION

St. Luke's asserts that Church Mutual's handling of its insurance claim violated the Texas Insurance Code and breached the duty of good faith and fair dealing.  Church Mutual advances two main grounds for partial summary judgment.[7]  First, St. Luke's does not provide evidence that it suffered damages that are separate from the amount that it is allegedly owed under the insurance policy.  (Dkt. No. 20 at 1).  Second, St. Luke's does not provide evidence that Church Mutual lacked a reasonable basis to deny the claim.[8]  (*Id.* at 1, 7).

St. Luke's responds that there is a genuine dispute of material fact as to whether Church Mutual improperly classified certain line items as "code upgrades" rather than

---

[7]     In this diversity case, the Court applies the substantive law of Texas.  *Turner v. Cincinnati Ins. Co.*, 9 F.4th 300, 308 (5th Cir. 2021) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)).

[8]     With respect to the code compliance repairs, Church Mutual also "seeks a partial summary judgment from the Court [1] that no payment for such damages was due or owing until such repairs were complete, and [2] that recovery of benefits under the Policy for any such damages is limited to $100,000."  (Dkt. No. 20 at 2, 17–19).  In response, St. Luke's asserts that this request "appears more in the nature of a request for declaratory relief (that is not pleaded) than a request for a ruling on a specific claim or defense of party."  (Dkt. No. 23 at 1).  The Court agrees with St. Luke's.  Church Mutual has not asserted a counterclaim and, in this context, is not seeking summary judgment on the breach of contract or declaratory judgment claims.  Nor does Church Mutual provide the Court with a legal basis that shows it "is entitled to judgment as a matter of law" in this regard.  *See* Fed. R. Civ. P. 56(a).  The Court **DENIES** Church Mutual's request.

"repair costs" to avoid paying St. Luke's covered damages, thereby breaching the Texas Insurance Code and the duty of good faith owed to it.  (Dkt. No. 23 at 1–2).  St. Luke's acknowledges that these arguments are relevant to the breach of contract claim—a claim that is not addressed in the Motion for Partial Summary Judgment.  (*Id.* at 2).  St. Luke's contends these arguments demonstrate the viability of its extra-contractual claims because the existence of its breach of contract claim means that St. Luke's does not need to provide evidence of an independent injury to proceed on its extra-contractual claims. (*Id.* at 2–3, 13).  Additionally, the extra-contractual claims also can stand on their own because Church Mutual improperly denied the claim, delayed the investigation for more than one year, applied excessive depreciation, and reduced the payout to St. Luke's by arbitrarily classifying repair costs as code upgrades.  (*Id.* at 3, 11–12).

### A.    INDEPENDENT-INJURY RULE

Church Mutual first argues that St. Luke's' extra-contractual claims fail as a matter of law under the independent-injury rule.  (Dkt. No. 20 at 15–17).  St. Luke's contends this rule does not apply.  (Dkt. No. 23 at 13).  St. Luke's is correct.

The Supreme Court of Texas has described "five distinct but interrelated rules that govern the relationship between contractual and extra-contractual claims in the insurance context."  *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2018).  Three are relevant here:

> First, as a general rule, an insured cannot recover policy benefits as damages for an insurer's statutory violation if the policy does not provide the insured a right to receive those benefits.

> Second, an insured who establishes a right to receive benefits under the insurance policy can recover those benefits as actual damages under the Insurance Code if the insurer's statutory violation causes the loss of the benefits . . . .
>
> [And], if an insurer's statutory violation causes an injury independent of the loss of policy benefits, the insured may recover damages for that injury even if the policy does not grant the insured a right to benefits.

*Id.*

The Court begins with the first rule: St. Luke's generally cannot recover policy benefits as damages for Church Mutual's alleged statutory violation if the insurance policy does not provide St. Luke's with a right to receive those benefits.  *See id.* at 490–95. The Parties agree that there is a live dispute as to whether St. Luke's is entitled to additional policy benefits under the insurance contract.   Because there is no determination at this stage whether St. Luke's has a right to receive the additional benefits, the Court cannot conclude that St. Luke's is categorically prohibited from asserting extra-contractual claims.  In other words, it remains to be seen whether the policy provides St. Luke's "a right to receive those benefits."  *See Menchaca*, 545 S.W.3d at 489.

This is where the second *Menchaca* rule comes into play.  Again, "an insured who establishes a right to receive benefits under the insurance policy can recover those benefits as actual damages under the Insurance Code if the insurer's statutory violation causes the loss of the benefits."  *Menchaca*, 545 S.W.3d at 489.  Put differently, "[i]f an insurer's wrongful denial of a valid claim for benefits results from or constitutes a statutory violation, the resulting damages will necessarily include at least the amount of

the policy benefits wrongfully withheld." *Id.* at 496 (internal quotations omitted).  For example, the Supreme Court of Texas has found that a plaintiff can recover "at least the amount of the policy benefits wrongfully withheld" when the plaintiff succeeds on common-law bad faith and statutory violations at trial but does *not* assert a breach of contract claim. *Id.* at 495 (citing *Vail v. Tex. Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 130, 136 (Tex. 1988)).  In other words, a plaintiff can recover the amount owed under an insurance policy without necessarily asserting a breach of contract claim. *Id.*  This rule is known as the "entitled-to-benefits rule." *Id.*  Here, St. Luke's has pursued a breach of contract claim as well as claims under the Texas Insurance Code and common law.  The second *Menchaca* rule authorizes this approach.

Despite the application of the second *Menchaca* rule, Church Mutual urges the Court to read the last of the above *Menchaca* rules—the independent-injury rule—as precluding the extra-contractual claims brought by St. Luke's.  Specifically, it argues that the extra-contractual claims categorically "require evidence that the plaintiff suffered damages *other* than unpaid policy benefits."  (Dkt. No. 20 at 16) (emphasis in original).  Church Mutual is incorrect.

There are two aspects of the independent-injury rule.  First, "if an insurer's statutory violation causes an injury independent of the insured's right to recover policy benefits, the insured may recover damages for that injury even if the policy does not entitle the insured to receive benefits."  *Menchaca*, 545 S.W.3d at 499.  Second, "an insurer's statutory violation does not permit the insured to recover *any* damages beyond policy benefits unless the violation causes an injury that is independent from the loss of

the benefits." *Id.* at 500 (emphasis in original).  Church Mutual focuses on this second aspect, arguing that St. Luke's fails to provide evidence of an injury that is independent from the loss of benefits.  (Dkt. No. 20 at 16–17).

Church Mutual overlooks the fact that St. Luke's is not pursuing an independent-injury theory by seeking damages *outside of* the allegedly denied policy benefits.  Rather, the damages St. Luke's seeks *are* the policy benefits.  *Menchaca* "clarifies definitively that where an insured seeks to recover damages for an insurer's violations of the Texas Insurance Code, the insured must prove either (1) a right to receive benefits under the policy; or (2) compliance with the independent-injury rule."  *Garza v. Allstate Fire & Cas. Ins. Co.*, 466 F. Supp. 3d 705, 713 (S.D. Tex. 2020); *accord Burgess v. Allstate Fire & Cas. Ins. Co.*, ____ S.W.3d ____, ____, No. 03-20-00088-CV, 2021 WL 5498758, at *7 (Tex. App.—Austin Nov. 24, 2021, no pet.).  St. Luke's has elected to pursue the first option but not the second.  Thus, Church Mutual misreads *Menchaca* as holding that the independent-injury rule requires an independent injury to assert extra-contractual claims.

Church Mutual's position is also contrary to Fifth Circuit precedent.  In *Lyda Swinerton Builders, Incorporated v. Oklahoma Surety Company*, the plaintiff argued that the district court erred by rendering judgment for the defendant.  903 F.3d 435, 451 (5th Cir. 2018).  The district court construed Texas law to require a plaintiff to first establish an independent injury before obtaining extra-contractual damages under the Texas Insurance Code.  *Id.*  The Fifth Circuit reversed and remanded.  *Id.* at 453.  Relying on *Menchaca*, the Fifth Circuit reiterated that "the independent-injury rule does not restrict the damages an insured can recover under the entitled-to-benefits rule."  *Id.* at 452.

14

Instead, "the independent-injury rule limits the recovery of *other* damages that 'flow' or 'stem' from a mere denial of policy benefits." *Id.* (emphasis in original). Accordingly, the Fifth Circuit held that the plaintiff could recover actual damages under Chapter 541 if, on remand, the plaintiff could establish that the defendant's alleged misrepresentations caused the plaintiff to be deprived of a benefit under the insurance policy. *Id.* at 453. For good measure, the Fifth Circuit reiterated that the recovery of any actual damages in this manner is "without limitation from the independent-injury rule." *Id.*

In sum, Church Mutual urges the Court to adopt an improper reading of Texas law.[9] In this respect, the Court denies the Motion for Partial Summary Judgment.

### B.   BAD FAITH CLAIMS

Church Mutual's second argument is that bad faith claims alleged by St. Luke's fail on the merits. Even assuming that St. Luke's can succeed on its breach of contract claim at trial, Church Mutual maintains the bad faith claims still fail because there is no evidence of bad faith.

Claims under Chapter 541 of the Texas Insurance Code and under the common law duty of good faith and fair dealing are analyzed together. *See, e.g., Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 133 (Tex. 2019). The claims are analyzed together because these extra-contractual claims share the same predicate for recovery: bad faith. *Higginbotham*

---

[9]   In support of its arguments, Church Mutual also relies on federal district court opinions that pre-date *Menchaca*. (Dkt. No. 20 at 13 n.45, 16 n.55). *Menchaca* and *Lyda*, however, guide this Court's analysis.

*v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997); *accord Alvarado v. State Farm Lloyds*, No. 7:14-CV-166, 2016 WL 6905865, at *4 (S.D. Tex. June 15, 2016).

### 1.    Chapter 541 of the Texas Insurance Code

St. Luke's alleges that Church Mutual's claims handling process violated Section 541.060 of the Texas Insurance Code.[10]  (Dkt. No. 1-3 at 4).  Section 541.003 prohibits "a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."  Tex. Ins. Code § 541.003.  Section 541.060 provides that certain settlement practices constitute "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance[.]"  *Id.* § 541.060(a).  There are two settlement practices that are referenced by St. Luke's.  *See* (Dkt. No. 1-3 at 4).  First, Church Mutual allegedly failed "to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear[.]"  *See* Tex. Ins. Code § 541.060(a)(2)(A).  Second, Church Mutual allegedly refused to pay the claim "without conducting a reasonable investigation with respect to the claim[.]"  *See id.* § 541.060(a)(7).  Section 541.151 provides a private cause of action for violations under Section 541.060.  *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 438 (Tex. 2012).

---

[10]  St. Luke's notes that Church Mutual has not moved for summary judgment on St. Luke's' claim under Chapter 542 of the Texas Insurance Code.  (Dkt. No. 23 at 3 n.2).  Church Mutual's Motion for Partial Summary Judgment and Reply do not make arguments responding to St. Luke's' Chapter 542 claim.  *See* (Dkt. No. 20); (Dkt. No. 24).  The Court therefore does not reach the Chapter 542 claim.  For the same reason, the Court does not reach the declaratory judgment claim brought by St. Luke's.

### 2.    Common Law Duty of Good Faith and Fair Dealing

St. Luke's also asserts a claim for breach of the common law duty of good faith and fair dealing.  Here, St. Luke's essentially makes the same two allegations that it made with respect to its Chapter 541 claims: Church Mutual refused to pay, or delayed in paying, the insurance claim after liability became reasonably clear, (Dkt. No. 1-3 at 4), and Church Mutual's investigation was deficient, (*id.* at 5).

Under Texas law, an insurer has a common law duty of good faith and fair dealing. *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).  A plaintiff can assert a claim under the common law duty of good faith and fair dealing by alleging (1) "that the insurer had no reasonable basis for the denial or delay in payment of a claim"; and (2) "that the insurer knew or should have known of that fact."  *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex. 1994); *accord Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 869 (5th Cir. 2014).  The evidence must "permit the logical inference that the insurer had no reasonable basis to delay or deny payment of the claim, and that it knew or should have known it had no reasonable basis for its actions." *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993).  The focus is not on whether the claim was valid.  *Id.* at 601.  Rather, the focus is "on the reasonableness of the insurer's conduct in rejecting the claim."  *Id.*

### 3.    Analysis of Statutory and Common Law Bad Faith Claims

Having provided an overview of the law governing both bad faith claims, the Court turns to the Parties' arguments and the evidence.  Again, "an insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis

for denial of that coverage." *Higginbotham*, 103 F.3d at 460. "Evidence that only shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." *U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997) (per curiam). This bona-fide-dispute rule applies to claims for breach of the duty of good faith and fair dealing, *id.*, and claims for bad faith under Chapter 541 of the Texas Insurance Code. *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 525 (5th Cir. 2015).

Broadly, Church Mutual asserts that the claim was handled reasonably.[11]  (Dkt. No. 20 at 1, 7–8).  In response, St. Luke's points to three separate pieces of evidence that contradict this assertion: the initial perfunctory denial of the claim and then the lengthy duration of the investigation into the claim; the determination of the costs of code upgrades; and the calculation of depreciation on the building.  (Dkt. No. 23 at 3, 11–12). The Court concludes that Church Mutual has not carried its burden of demonstrating the absence of a genuine issue of material fact regarding the bad faith claims.

The Court begins with Church Mutual's initial response to the insurance claim and the timeline of the investigation.  For starters, Church Mutual's initial response to the insurance claim sowed confusion.  St. Luke's submitted an insurance claim on August 29,

---

[11]    Rather than cite to specific pages in the record, both Parties often cite to exhibits as a whole or simply fail to cite to the record at all.  It is not the Court's task to search the record for the Parties.  *United States v. del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (per curiam); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("A district court's decision on summary judgment is largely controlled by what the parties presented.  If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

2017.  (Dkt. No. 20-2 at 1).  Church Mutual responded the following day by stating that coverage for windstorm damage was excluded.  (*Id*.).  At some point in the following weeks, Church Mutual then denied St. Luke's windstorm coverage.  (Dkt. No. 23-1 at 5–6, 54–56).  By the middle of September, Church Mutual had backtracked—St. Luke's did, in fact, have windstorm coverage.  (*Id*. at 8–10, 47); (Dkt. No. 20-1 at 1).  But, for almost three weeks, St. Luke's was left with the impression that the overwhelming majority of the damage from Hurricane Harvey would not be covered.

This impression was seemingly reinforced by Church Mutual's initial investigation.  Briggs, Church Mutual's independent adjuster, inspected the church two days after the insurance claim was submitted.  (Dkt. No. 20-4 at 1).  Following the inspection, however, Briggs told St. Luke's that it should contact the Texas Windstorm Insurance Association.  (Dkt. No. 23-1 at 4); (Dkt. No. 23-2 at 2–4).  Sometime after the September inspection but before the mid-October letter, Briggs also determined that St. Luke's had a net claim of $34,019.79.  (Dkt. No. 20-4 at 7–9).  One possible interpretation of Church Mutual's subsequent letter in mid-October 2017 is that Church Mutual doubled down on an estimate that did not factor in wind coverage.  After completing its "analysis of potential policy benefits," the letter incorporated Briggs's $34,019.79 figure.  (Dkt. No. 20-5 at 1).  Yet Church Mutual's reiteration of this figure seemingly came *after* it recognized the error regarding the windstorm coverage.  To what extent the initial estimate was affected by the erroneous windstorm exclusion is unclear.  Even if the erroneous windstorm exclusion had no impact on Church Mutual's initial estimate, there is a considerable difference between the initial payment Church Mutual issued in 2017,

$34,019.79, and the combined amount that Church Mutual ultimately issued after completing its inspection of the steeple, $551,630.09.  *Compare* (Dkt. No. 20-5) *with* (Dkt. No. 20-7); (Dkt. No. 20-9 at 1–2).

The subsequent investigation and resolution of the claim took various twists and turns.  In late September 2017—less than a month after St. Luke's submitted its insurance claim—Church Mutual requested an additional thirty days to complete its investigation. (Dkt. No. 20-3); (Dkt. No. 23-1 at 9).  The investigation took years, not days.  In October 2017, Church Mutual asked Rimkus to examine the steeple.  (Dkt. No. 23-1 at 16, 44).  Van Sant then inspected the church in March 2018.  (Dkt. No. 20-6 at 1); (Dkt. No. 23-3 at 6, 13); (Dkt. No. 23-1 at 79).  In November 2018, Van Sant completed a second inspection. (Dkt. No. 23-3 at 10–11, 13).  Van Sant's final report was issued in February 2019.  (Dkt. No. 23-1 at 79–81).  But his report was revised the following month in March 2019—this time with changes to the code-upgrade and depreciation amounts.  (Dkt. No. 23-3 at 19–21); (Dkt. No. 23-1 at 117).  The revised estimate was issued approximately eighteen months after St. Luke's submitted its original insurance claim.  In addition, subsequent payments—separate and apart from the initial payment—were issued in June 2019, March 2021, and April 2021.  (Dkt. No. 20-7); (Dkt. No. 20-9 at 1–2).

The length of time it took to obtain scaffolding to accurately assess the damage was a large reason for Church Mutual's overall delay in processing the claim.  As early as November 2017, Rimkus requested scaffolding to inspect the damage to the church. (Dkt. No. 23-1 at 20–21).  Two months later, Rimkus reiterated the request and had even gone so far as to collect cost estimates for scaffolding.  (*Id.* at 21–22).  Notwithstanding,

20

the March 2018 inspection did not include scaffolding. (Dkt. No. 23-3 at 6). It was not until the November 2018 inspection—one year after the initial request—that scaffolding was provided and used. (Dkt. No. 23-1 at 23); (Dkt. No. 23-1 at 10–11, 13).

Next, St. Luke's points to the difference in code upgrade estimates provided by the two experts as evidence of bad faith. (Dkt. No. 23 at 12). Because there was no explanation for reallocating certain repair costs as code upgrades, St. Luke's reasons, there is a genuine issue of material fact regarding bad faith. (*Id.*). Church Mutual agrees that the difference between the two estimates constitutes the crux of this lawsuit. (Dkt. No. 24 at 4). But Church Mutual insists that this is a contractual dispute—a claim not addressed in the Motion for Partial Summary Judgment. (*Id.*). According to Church Mutual, St. Luke's "fails to provide competent evidence that Church Mutual had no reasonable basis to calculate [the] code-compliance related damages as being higher than [St. Luke's'] expert concluded." (*Id.* at 5).

To be sure, the primary basis of the breach of contract claim is the Parties' disagreement over the propriety of labeling certain property repairs as code upgrades. In this respect, Church Mutual is correct that these arguments are relevant to the breach of contract claim. But here, the bad faith claim is based in part on *how* Church Mutual determined these costs were for code upgrades, not the determination itself. And St. Luke's points to evidence in support. Van Sant issued a final report. (Dkt. No. 23-1 at 79–81). The following month, Church Mutual's adjustor instructed Van Sant to reallocate estimated repair costs as code-upgrades and depreciation—which are not covered in full by the policy. (Dkt. No. 23-3 at 19); (Dkt. No. 23-1 at 117). Van Sant did as he was told.

(Dkt. No. 23-3 at 21).  In reallocating certain costs as code upgrades, Van Sant did not determine what building codes these repairs were supposed to comply with.  (*Id.* at 21–22).  Church Mutual offers little in explanation for this considerable change in the estimated insurance claim.

Last, St. Luke's argues that Church Mutual arbitrarily depreciated the recoverable damages and did not complete an analysis of the condition of the church.  (Dkt. No. 23 at 8–9, 12).  Like the determination of code-upgrade costs, St. Luke's points to Van Sant's estimates.  In the revised estimate, Van Sant depreciated costs at the direction of Church Mutual's adjuster.  (Dkt. No. 23-3 at 18, 20–21).  But Van Sant himself did not calculate depreciation.  The only evidence that Church Mutual identifies regarding the calculation of depreciation is its standard practice not to depreciate more than fifty percent.  (Dkt. No. 24-1 at 6).  But this says little about whether Church Mutual acted in good faith when it calculated the depreciation amount.  Indeed, the entire theory of this case offered by St. Luke's is that there is a consistent pattern of improper conduct.

In sum, the evidence, considered together, demonstrates that there is a genuine issue of material fact as to whether Church Mutual acted in bad faith.  To be sure, Texas law is clear that bona fide coverage disputes do not demonstrate bad faith.  But the Court is not persuaded that this case is simply a coverage dispute.  Consider *Weiser-Brown*, where the Fifth Circuit agreed with the district court that there was no legally sufficient basis to find bad faith under Chapter 541 of the Texas Insurance Code.  801 F.3d at 526. The Fifth Circuit relied in part on the insurance company's efforts over the course of four months "to obtain an expert opinion on a complicated coverage issue."  *Id.* at 527.  But

unlike in *Weiser-Brown*, Church Mutual's efforts took years rather than months.  And unlike in *Weiser-Brown*, the evidence indicates there may be more than just a complicated coverage issue.  Rather, the evidence raises questions about extensive delays, multiple changes in the level of coverage, and inadequate explanations for decisionmaking.

## IV.    CONCLUSION

Because there is a genuine issue of material fact as to whether Church Mutual acted in bad faith, the Court **DENIES** the Motion for Partial Summary Judgment.  (Dkt. No. 20).

It is SO ORDERED.

Signed on March 31, 2022.

DREW B. TIPTON
**UNITED STATES DISTRICT JUDGE**